ALTER, BISHOP OF TOLEDO, APPELLEE, *v.* THE SECURITY
BUILDING & LOAN CO. OF DEFIANCE, APPELLANT.

(Decided October 25, 1937.)

*Mr. J. F. Cavanagh*, for appellee.
*Mr. R. H. Sutphen*, for appellant.

CROW, J. This case was appealed on questions of law and fact from the Common Pleas Court of Defiance county, Ohio, where it originated. It was submitted here on questions of law only.

The facts can well be stated with conciseness. At the time of the transactions in issue defendant was and ever since has been a building and loan association organized and existing under the laws of the state of Ohio, with its office and principal place of business at Defiance therein.

It issued a passbook to Mr. and Mrs. Diehl, on each page of which excepting a printed one hereinafter mentioned, were four columns, the first being for dates, and the other three for "Payment," "Withdrawal," and "Balance," respectively.

The first entry was of date October 22, 1927, "Balance from old Bk. $12,734.59," and the next one, dated October 29, 1937, shows $30 in the "Payment" column; and other entries in that column are shown, ranging in amounts from $7.32 to $1,030, most of which are $30 each and weekly.

In the "Payment" column are entries of dividends noted as "Div.," beginning January 31, 1928.

Entries of "Withdrawals" appear in various amounts intermittently up to $1,931.59 commencing February 15, 1928, for $295, and ending July 24, 1935, for $100.84, which latter entry was the last in the book, leaving the "Balance" due the Diehls $26,702.66.

On July 30, 1935, the Diehls, for a valuable consider-

ation, executed and delivered an order to plaintiff in the following words:

"Defiance, Ohio, July 30, 1935.

"The Security Building and Loan Co., Defiance, Ohio.

"Pay to Karl J. Alter Bishop of Toledo Nineteen Thousand Nine Hundred Seventy Six and 58/100 Dollars, $19,976.58 and charge to my Savings Account No. 2063. This order is positively not negotiable and will be paid only to the person to whom drawn. It must be accompanied by the pass book from which withdrawal is made."

> "Frank B. Diehl
> "Mrs. Frank B. Diehl."

Excepting the following, written in ink, the order is in printed form: "July 30," "5," "Karl J. Alter Bishop of Toledo Nineteen Thousand Nine Hundred Seventy Six and 58/100," "$19,976.58," "2063," "Frank B. Diehl," "Mrs. Frank B. Diehl."

On the date last mentioned plaintiff owed mortgage indebtedness to defendant in a sum exceeding one-half of the amount named in the order and on that date presented the order to defendant and then tendered to it in money an amount equivalent to the amount named in the order and demanded that the aggregate of said two amounts be applied to the payment of said indebtedness owed by plaintiff to defendant, which demand was refused.

The purpose of this suit is to establish in plaintiff the right of set-off of the amount of the order.

The printed page of the pass book above referred to is as follows:

"Instructions to Members.

"1. This book MUST always be presented when payment is made or money withdrawn.

"2. If this book is lost or stolen, notify the company at once.

"3. All transfers must be made on the books of the company.

"4. In February and August of each year, this book MUST be left at the office of the company to be audited and balanced. '

"5. As a general rule money paid in on this book may be withdrawn at any time without notice, but to protect the interest of members, and borrowers, and to avoid the sacrifice of securities, notice of withdrawal may be required. Withdrawal notice of members will be filed in the order in which they are received and paid from the regular receipts of the company in the order filed. As to dividend rights, a notice to withdraw shall be deemed the same as an actual withdrawal."

Defendant had three classes of members, paid up stockholders, running stockholders and borrowers, and it never availed itself of the right to "receive money on deposit" as it might have done under Section 9648, General Code, which is quoted later.

Defendant has been solvent at all times and neither of the Diehls was ever a borrower.

Plaintiff relies on Section 9652-1, General Code (115 Ohio Laws, Part 2, 398), passed June 28, 1934, as follows:

## "An Act

"To supplement Section 9652 of the General Code by the enactment of supplemental Section 9652-1 of the General Code, relative to rights of depositors of building and loan associations, and to declare an emergency.

"Be it enacted by the General Assembly of the state of Ohio:

"Section 1. That Section 9652 of the General Code be supplemented by the enactment of supplemental Section 9652-1 of the General Code, to read as follows:

"Discharging obligations with credit: transfer of credit.

"Section 9652-1. A borrower from a building and loan association may tender in discharge and payment

of his obligations to the association, or any part thereof, credit to a deposit account standing in the name of the borrower on the books of the association, or such amount thereof at face value 'as may be sufficient for such purpose, regardless of the time or times when such credit or any part thereof may have been created or transferred to the name of such borrower, and the association shall accept such tender at the full face value of such credit in satisfaction and discharge of such obligations or a part thereof; provided, however, that for each dollar of credit to a deposit account so tendered, the borrower shall, if required by the association, pay one dollar in cash.

"No association shall refuse to transfer a credit, or a portion thereof, on its books unless the association shall have a valid lien thereon, or a valid right of appropriation thereof, or unless the transferee is not the owner of the credit sought to be transferred.

"Emergency.

"Section 2. This act is hereby declared to be an emergency law, necessary for the immediate preservation of the public peace, health and safety. The reason for such necessity lies in the fact that at the present time in the state of Ohio, many certificates of deposit are being sold for considerably less than their real value. This will have a tendency to increase the demand for such deposits, and thereby enable the depositor who is desirous or forced to sell, to obtain a higher price for his investment, and assist in relieving the widespread distress now prevailing in many communities. Therefore, this act should go into effect immediately."

Counsel for plaintiff argues that unless the quoted enactment is broad enough by the employment of the words "credit to a deposit account" to include a running stock account, there would have been no reason for its enactment because it was the law as settled by two Courts of Appeals that a borrower had the right

to enforce a set-off against his debt to an association, a deposit other than for the purchase of stock. One of the cases (*Leimons* v. *Lithuanian Savings & Loan Assn.*), decided May 8, 1933, is in 44 Ohio App., 454, 186 N. E., 107, and the other (*Hensch* v. *Metropolitan Savings & Loan Co.*), decided January 28, 1935, appears in 50 Ohio App., 25, 197 N. E., 416. Those two cases do establish the right of set-off, and in each the deposit was of such nature as to create the relation of debtor and creditor between the association and the depositor respectively.

In the first of the two cases the borrower seeking the set-off was also a stockholder to the extent of one share, and in both cases the subjects of the set-off were designated as "savings accounts." The share of stock was not involved.

Plaintiff's counsel eschews any purpose to place the Diehls in the attitude of withdrawers by the act of assigning their rights to plaintiff, and in consequence we copy farther on, for another purpose, statutory provisions relating to withdrawals.

With the issue encompassed to the sole point of applicability of the statute already quoted we may properly omit allusion to many of the statutes governing building and loan associations in Ohio from their inception, and we now set forth in full some other statutes which we regard essential to the interpretation of Section 9652-1, General Code.

At all the times that the Diehls and plaintiff had the transactions involved in this suit, Section 9648, General Code, read and now reads as follows:

"To receive money on deposits, and all persons, firms, corporations and courts, their agents, officers and appointees may make such deposits and stock deposits, but such corporation shall not pay interest thereon exceeding the legal rate. When such deposits or stock deposits are made to the joint account of two or more persons, whether adults or minors, with a joint

order to the corporation that such deposits or any part thereof are to be payable on the order of any one or more of such joint depositors, and to continue to be so payable notwithstanding the death or incapacity of one or more of the persons making them, such account shall be payable to any one or more of such survivors or survivor or order notwithstanding such death or incapacity. No recovery shall be had against such corporation for amounts so paid and charged to such account.''

During the same periods of time Section 9652, General Code, was and now is in these words:

''To permit withdrawal of deposits upon such terms and conditions as the association provides except by check or draft. But no such association shall be permitted to carry for any member or depositor any demand, commercial or checking account. Nothing in this chapter shall prevent members or depositors from withdrawing funds by non-negotiable orders.''

During all the times the Diehls made their payments to defendant, until June 29, 1934, the following two sections of the General Code were in effect:

Section 9649 (110 Ohio Laws, 62, at 68). ''To issue stock to members upon certificates or upon written subscription on such terms and conditions as the constitution and by-laws provide, but no initiation or membership fee shall be charged and if the stock is sold at a premium all such premiums shall be placed in the reserve fund of the association. Each member may vote his stock to the extent and in the manner provided by the constitution and by-laws, but no member shall cumulate his votes.''

Section 9651 (99 Ohio Laws, 529). ''To permit members to withdraw all or part of their stock deposits, at such times, and upon such terms, as the constitution and by-laws provide. Any member, however, who withdraws his entire stock deposit, or whose stock has matured, shall be entitled to receive all dues paid in

and dividends declared thereon, less all fines or other assessments, and less the pro rata share of all losses, if any have occurred.''

By amendment (115 Ohio Laws, Part 2, 380), commencing on the date last mentioned, the two sections just quoted have read and now read in these words:

Section 9649. ''To issue stock to members upon certificates or upon written subscription on such terms and conditions, consistent with the provisions of this chapter, as the constitution and by-laws provide, but no initiation or membership fee shall be charged and if the stock is sold at a premium all such premiums shall be placed in the reserve fund of the association. All amounts, excepting fines and premiums, paid in by a member, as such, on any one account, together with all credits thereon, shall be considered payments on a stock subscription, and the aggregate of such payments and credits, less any charges thereto, shall constitute a stock credit of such member for the purposes of this chapter. Each member may vote his stock or fractional part thereof to the extent and in the manner provided by the constitution and by-laws, and each member may cumulate his votes in the election of directors. Nothing herein contained shall be construed to prohibit the issuance of permanent stock.'' (This section was again amended in 116 Ohio Laws, Part 1, 485, but the amendment did not affect the above quoted portion.)

Section 9651. ''To permit members to have their stock credits repurchased by the association in part or in full, at any time, and to require members to file applications therefor. Upon the receipt of such applications for repurchase, the association shall number and file the same in the order received and shall, within thirty days from the receipt of an application, either pay the holder the amount thereof in part or in full as requested, in the order filed, or apply at least one-third of the cash receipts of the association received

thereafter (after making proper provision for the payment of interest on deposits, dividends paid on stock and stock deposits, borrowed money and taxes) from all sources except borrowed money, the proceeds from the sale of assets, and the proceeds derived from foreclosure proceedings where the association is the purchaser, to the retirement of such applications in numerical order. Provided, however, that the board of directors shall have an absolute right to pay out of said one-third of said cash receipts or out of any other funds, in respect of any application, not exceeding one hundred dollars of any one stock account in any one month in any order; and provided further, that if any stockholder applies for the repurchase of more than one thousand dollars of any stock account or accounts he shall not be paid in excess of one thousand dollars in order when reached, subject to the foregoing provisions of this section, and his application shall be charged with such amount and shall be renumbered and placed at the end of the list of applications for repurchase and thereafter, upon again being reached, shall be paid a like amount, but not exceeding the amount of his stock account; and until paid in full shall continue to be so paid, charged, renumbered, and replaced at the end of the list until paid in full. Stockholders whose stock accounts, or parts thereof, are repurchased, shall thereupon be relieved of all liability with reference thereto. Stockholders filing written application for the repurchase of their stock credits shall remain stockholders until paid, and shall not become creditors. Dividends upon the stock credit of any stockholder, to the extent of the amount of the application to repurchase, shall be discontinued while such application remains upon a list for the repurchase of stock credits; provided that dividends that would otherwise be paid upon such stock credits shall not be discontinued, notwithstanding the application

of repurchase, in case said application is withdrawn in consideration of restoration of said dividends. The repurchase value of the stock credit so requested to be repurchased shall be the amount thereof as defined by Section 9649 of the General Code. In the event that the stock credit proposed to be repurchased is pledged with the association as collateral security for the payment of a loan, the amount of such loan, plus all interest and lawful charges thereon, shall be deducted from the repurchase value before any amount is paid to the member. No repurchase notice shall be deemed to have been received or to be valid on account of any stock credits which have been transferred on the books of the association within a period of sixty days preceding the date of such notice of repurchase.

"Provided, however, that whenever and so long as the association is on notice, it may refuse to repurchase stock credits. Provided further that associations having deposits greater than the aggregate amount of stock credits, reserve, and undivided profits, shall not repurchase stock credits whenever and so long as the association has on file unsatisfied applications for the withdrawal of deposits."

The two amended sections just quoted, 9649 and 9651, and Section 9652-1, General Code, were passed and took effect on the same day, and amended Section 9649, General Code, appears at page 380, amended Section 9651, General Code, at pages 380 and 381, and Section 9652-1, General Code, at pages 398 and 399, respectively, of Volume 115, Part 2, Ohio Laws.

Other statutes to be considered, but unnecessary to completely copy, follow. Section 9654, General Code, in effect during the whole time that the Diehls left their money with defendant, empowered a building and loan association "to issue stock to minors and receive deposits thereon and permit both stock and deposits

to be withdrawn," and "to receive deposits of money by or for minors."

Section 9656, General Code (115 Ohio Laws, Part 2, 382), effective June 29, 1934, conferring power to borrow money, makes reference to the "amount paid in by stockholders and depositors" and of "the amount so paid in by stockholders and depositors for the purpose of paying applications for the withdrawal of deposits and the repurchase of stock credits."

Section 9671, General Code, also effective on the last named date, employs the words "stock credits" and "deposits."

No statute existing in Ohio during the transactions of the Diehls with defendant, contained any allusion in terms to either a savings account or a savings deposit notwithstanding the references aforementioned in the two decisions of Courts of Appeals.

Section 9652-1, General Code, itself limits the subject of the set-off, to "credit to a deposit account," and once more employs the words "deposit account" in the body of the enactment whilst the emergency clause, Section 2, designates, as covering deposit accounts "certificates of deposit" and also speaks of "such deposits" and "the depositor." And the body of the enactment, in the last sentence uses the word "credit" as synonymous with the phrase "credit to a deposit account."

The words "certificates of deposit" in the emergency clause are undoubtedly to be taken as meaning documents showing deposits, which certificates may be in either the form of pass books or any other appropriate written and/or printed recital.

There is nowhere in the section any such expression as stockholder, stock credit, or stock deposit.

Distinctly and with extreme repetition the statutes quoted wholly or partially, other than Section 9652-1, General Code, recognize an unmistakable differentia-

tion of the legal status of stockholders and depositors, by using the designations, "stock holders," "stock deposits," "stock accounts," "stock credits" (eleven times in Section 9651, General Code), "deposits" and "depositors."

"Stockholder" thus means an owner of stock, either paid up or running, of an association, and the words mentioned in connection with stock refer to the bookkeeping pertaining to it; "depositor" means one who places money with an association pursuant to Section 9648, General Code, under such circumstances that the placer of the money becomes at once a creditor of the association, though payment by it may be postponed in accordance with the laws of the association or by contract between it and the placer; and "deposit" means the money so placed.

There is nothing whatsoever in Section 9652-1, General Code, evincing a purpose to employ the words "credit to a deposit account" in a sense other than in consonance with the words "deposits" and "depositors" in the other statutes passed earlier and contemporaneously which so clearly distinguish deposits from stock.

The conclusion is inescapable that a deposit account within the intent of Section 9652-1, General Code, represents money with an association not in payment for stock, but to establish between the association and the one delivering the money, the relation of debtor and creditor respectively. Wherefore the relation borne by the Diehls to defendant was that of stockholders of running stock; and under the laws of the association they could not have been otherwise, inasmuch as the association did not receive money on deposit and did not conduct itself in a manner to estop it from so asserting.

A simple and true test of whether the Diehls were stockholders or depositors would lie in a determination

of an issue of the superadded liability imposed by the Ohio‟ Constitution when defendant received its money.

Whatever may have been the legislative motive for enactment of Section 9652-1, General Code, whether to strengthen the cash resources of a building and loan association against the right of set-off or not, the certain effect of the statute is to restrict the right to one-half instead of the whole of a deposit account.

Whether an institution can provide that the owner of such an account may fully apply the same in discharge of his indebtedness, is a point not in this case.

Plaintiff having acquired no right beyond what Diehls had, cannot prevail and hence the judgment for plaintiff must be reversed, and the record clearly showing no basis for recovery in plaintiff, final judgment must be entered for defendant.

*Judgment reversed.*

GUERNSEY, P. J., and KLINGER, J., concur.